# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**WALTER KOZAK d/b/a**
**Gunny's Intrastate Travel and Tours,**

        **Plaintiff,**

vs.                                  **Case No. 8:04-CV-1162-T-27TBM**

**HILLSBOROUGH PUBLIC**
**TRANSPORTATION COMMISSION,**

        **Defendant.**

_____/

## ORDER

**BEFORE THE COURT** is Defendant Hillsborough County Public Transportation Commission's Motion for Summary Judgment (Dkt. 96), Plaintiff's *pro se* response in opposition (Dkt. 106), and Defendant's reply (Dkt. 111). On January 5, 2010, the Court heard oral argument on the motion. Upon consideration, Defendant's Motion for Summary Judgment is GRANTED.

Plaintiff operates a ground transportation service utilizing a 15 passenger vehicle and a 7 passenger mini-van. Plaintiff's business is based in Hernando County. Plaintiff also contracts with individuals and travel agencies to transport passengers to locations in Hillsborough County, such as Tampa International Airport ("TIA") and the port facilities in Tampa.

Defendant Hillsborough County Public Transportation Commission ("the Commission") regulates ground transportation service in Hillsborough County pursuant to legislative authority. While the Commission's ground transportation regulations do not restrict Plaintiff from transporting passengers to locations in Hillsborough County, its rules require Plaintiff to obtain a certificate and

1

permit to pick up passengers in Hillsborough County. The practical effect of this restriction is that Plaintiff cannot provide round trip services to his clients without obtaining a certificate and permit from the Commission.

In Count I of the Amended Complaint, Plaintiff seeks declaratory and injunctive relief, contending that the Commission's regulation of ground transportation which requires him to obtain a certificate and permit before loading passengers in Hillsborough County in his 15 passenger vehicle is expressly preempted by 49 U.S.C. § 14501(a)(1)(C). Section 14501(a)(1)(C) prohibits state and local regulation of operating authority for "charter bus transportation." The issue is whether Plaintiff provides "charter bus transportation" when providing transportation to passengers using his 15 passenger vehicle. Defendant contends that Plaintiff's 15 passenger vehicle does not constitute a "bus" and that his services do not constitute charter bus transportation.

A secondary issue in the case is whether Defendant's application of its luxury transportation service rule to Plaintiff's minivan is preempted by federal law, which prohibits state and local regulations "related to price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

### Background

The Commission was created by the Florida Legislature to "regulate the operation of public vehicles upon the public highways of Hillsborough County and its municipalities." 2001 Fla. Laws 299 (the "Special Act" or "Ch. 2001-299") § 2(1); Dkt. 119, ¶ 4(g).[1] The Special Act defines a van as "any motor-driven vehicle with a capacity of 10 to 15 passengers, including the driver, for the

---

[1] The Special Act requires the Commission to regulate and supervise the operation of public vehicles in all matters affecting the traveling public; to comply with its rules relating to the application for and approval of certificates, permits, and public vehicle drivers licenses; and to determine whether public convenience and necessity require the operation of a public vehicle proposed in an application for a certificate or permit. *Id.* §§ 5(1)(a), (g), & (i); Dkt. 119, ¶ 4(m).

2

transportation of for hire passengers, which operates within [Hillsborough County] but does not include sight-seeing cars and buses, streetcars, motor buses operated pursuant to a franchise or courtesy vans, and limousines not for hire." Ch. 2001-299 § 3(33).

The Special Act requires any person wishing to operate a public vehicle conducting for-hire trips in Hillsborough County to obtain a certificate of public necessity and convenience, which is the Commission's "written authority . . . to operate one or more public vehicles in [Hillsborough County] and its municipalities." Ch. 2001-299 § 3(5); Dkt. 119, ¶ 4(l); *see also* Ch. 2001-299 § 7(2). Having acquired a certificate, a person must then obtain a permit, which is a "license issued by the commission to allow the operation of a particular public vehicle for which a certificate has been issued." Ch. 2001-299 § 3(20).

The Special Act defines a limousine as "any motor vehicle for hire not equipped with a taximeter, with a capacity for 15 passengers or less, including the driver." *Id.* § 3(17); Dkt. 119, ¶ 4(j). Commission Rule 1.15, the "luxury transportation service rule," initially defines a limousine using the language of the Special Act but adds this gloss:

> This definition consists of vehicles which are recognized by the industry as 'luxury' vehicles, that are considered as high-end luxury vehicles by the manufacturer and vehicles that have been uniquely modified so as to provide 'luxury' limousine service. The 'luxury' quality of vehicles will be determined by assessing aesthetics of the interior and exterior of the vehicle, amenities provided to the passenger, spaciousness and comparison to current industry standards for vehicles performing limousine service in Hillsborough County.

Dkt. 119, ¶ 4(k).

The Special Act also authorizes the Commission to grant variances and waivers. *Id.* § 5(mm); *see also Leib v. Hillsborough County Pub. Transp. Comm'n*, 558 F.3d 1301, 1305 (11th Cir. 2009). Finally, the Special Act authorizes any person aggrieved by a final decision of the Commission denying a certificate or denying a petition for a variance and waiver to seek judicial

3

review pursuant to the Florida Administrative Procedures Act. Ch. 2001-299 §§ 7(d), 13(2).

### *Plaintiff's business operations*

Plaintiff Walter Kozak, d/b/a Gunny's Intrastate Travel and Tours, is a sole proprietorship based in Hernando County, Florida. (Dkt. 119, ¶ 4(b); Dkt. 114, ¶ 9(b)). Plaintiff began operating in 2003 and is licensed by the State of Florida as a "seller of travel." *See* Fla. Stat. § 559.927(10) (Dkt. 119, ¶ 4(d)).[2] Plaintiff offers ground transportation and related transfers to and from airports, cruise ship ports and casinos in Tampa, Orlando, St. Petersburg, and Port Canaveral,[3] transfers to "Cruise Connection" buses in Clearwater and New Port Richey[4] that provide further transportation to cruise ship ports in South Florida,[5] and group special events and "charters."[6] Plaintiff utilizes a 15 passenger 2003 Ford E-350 and a 7 passenger 2003 Ford Windstar minivan. (Pl. Dep. I at 13, 15, 17; Pl. Dep. II at 8; Dkt. 119, ¶ 4(e)[7]).

Plaintiff testified that at times he contracts with travel agencies to transport their customers. (Pl. Dep. I at 60-65; 67-72, 74-77). Travel agencies hire Plaintiff to provide group transfers to the Port of Tampa, the Cruise Connection buses, and the Tampa and St. Peterburg airports. (Pl. Dep.

---

[2] *See* June 28, 2005, deposition of Walter Kozak (Dkt. 97 ["Pl. Dep. I"]) at 7.

[3] *See* Pl. Dep. I at 21-23, 38 & Exs. 3, 4 [Dkt. 97-3 at 7-12]).

[4] The Cruise Connection buses do not serve the Port of Tampa cruise ships. *See* April 30, 2009, deposition of Walter Kozak (Dkt. 98 ["Pl. Dep. II"]) at 28.

[5] *See* Pl. Dep. I at 38, 40 & Exs. 3, 4; *cf.* Pl. Dep. I at 33-34, 37; Pl. Dep. II at 28.

[6] *See* Pl. Dep. I at 38, 40, and Exs. 3 [Dkt. 97-3 at 7-10] & 4 [Dkt. 97–3 at 1-12]; Pl. Answer to Supp. Interrog. (Dkt. 96-2 ["Pl. Supp. Interrog."]) No. 11.

[7] At the time of Plaintiff's 2005 deposition, the minivan was not being used in the business. Pl. Dep. I at 13-14. However, it was back in service by the time of Plaintiff's 2009 deposition and is the 7 passenger minivan referred to in the Second Amended Complaint. Pl. Dep. II at 8-9.

I at 68-70, 72).[8]  Plaintiff's business records confirm that he contracts with travel agencies to provide round trip group transfers to locations in Hillsborough County.[9]  Plaintiff uses the 15 passenger vehicle when hired by travel agencies because "it [is] always groups." (Pl. Dep. I at 75; *cf.* Pl. Dep. I at 64).  Plaintiff charges a flat rate that does not depend on the number of passengers.  (Pl. Dep. I at 75-76).

Plaintiff has been doing business with travel agencies since he began operating.  (Pl. Dep. I at 74).  Travel agencies generally contract with Plaintiff for round-trip service.  (Pl. Dep. I at 72-73). Because he does not possess a certificate and fears enforcement and arrest by the Commission, Plaintiff arranges for a certificate holder to provide return transfers from Tampa.  (Pl. Dep. I at 73; Pl. Supp. Interrog. No. 4).

Plaintiff does not use the minivan to carry more than four passengers with luggage.  (Pl. Dep I at 84.)  Although Plaintiff never transports property by itself (Pl. Dep. II at 44-45), Plaintiff's passengers typically have baggage.  (Pl. Dep. II at 23-24).  Plaintiff transports that property as an ancillary service (Dkt. 88, ¶ 23).

Plaintiff's deposition testimony demonstrates that he primarily provides transfers to and from

---

[8]  Plaintiff does not get many requests to provide group transportation to the Port of Tampa "because [the travel agencies] know I don't do returns." (Pl. Dep. I at 69).

[9]  *See* Dkt. 98-2 at 23 (May 30, 2008; ACBS Travel; 6 passengers; round trip from "High Point C/C" [High Point Community Center?] to TIA) and 59 (Sept. 13, 2008; ACBS Travel; 12 passengers round trip from "Clover Leaf & H. Point" to TIA); Dkt. 98-3 at 35 (Apr. 16, 2007; ACBS Travel; 19 passengers; round trip from "Wellington Club House" to TIA) and 47 (May 24, 2007; ACBS Travel; 9 passengers; round trip from "H/Point Club House" to TIA); Dkt. 98-4 at 41 (July 25[, 2007]; "Vac Conn"; 13 passengers; round trip from Moose Lodge to "Air Tran"); Dkt. 98-6 at 33 (Oct. 12[, 2006]; "Vac Conn"; 11 passengers; round trip from "St. Joan of Arc" to TIA); Dkt. 98-7 at 5 (Jan. 8, 2005; "ABBA Group"; 14 passengers; round trip from "High Point C/C" to Port of Tampa: Royal Carribean); Dkt. 98-9 at 7 (June 17[, 2005]; "Vac Conn"; 10 passengers; round trip from Inverness Moose Lodge to TIA), 21 (July 5[, 2005]; Kathy's Tours; 8 passengers; round trip from "Performing Arts Ctr" to TIA); Dkt. 98-10 at 19 (Sept. 9, 2005; "ACBS Group"; 18 passengers; round trip from Wellington Club to TIA); Dkt. 98-11 at 14 (Nov. 14[, 2005]; Diana's Travel; 8 passengers; round trip from Senior Center Forest Oaks to TIA; "F/O Ken" [*i.e.*, farmed out to Ken]).  Apparently, the record does not contain Plaintiff's receipts or contracts for 2003 and 2004.

airports, cruise ship ports, and charter bus connections. However, Plaintiff provides "direct" service rather than "shuttle" service (Pl. Dep. I at 44, 55) or, as Plaintiff also terms it, "share ride" service. (Pl. Dep. II at 25). According to Plaintiff, "[s]huttle service is multiple stop, multiple pick-ups." (Pl. Dep. I at 44). Providers of shuttle service pick up multiple passengers and "make their money by putting more than one fare into the vehicle." *Id.* Their fares are lower. *Id.* By contrast, direct service "is a higher charge because [the clients are] the only ones. You're picking them up, taking them straight to their location, or meeting them at their location, taking them straight back." *Id.*

Plaintiff has never applied for a certificate or permit to operate the 15 passenger vehicle or the 7 passenger minivan in Hillsborough County. (Dkt. 119, ¶¶ 4(o), (p), (q)). When he began operating as Gunny's, Plaintiff could not obtain a permit for the minivan pursuant to the Commission rules because "[t]hey do not allow minivans." (Pl. Dep. I at 80[10]). Plaintiff admits that the minivan is not a limousine as that term is commonly understood. (Pl. Dep. II at 53).

Plaintiff has known since March, 2003 that providing for-hire transportation service in Hillsborough County could subject him to arrest. (Pl. Dep. I at 35-36 and Ex. 2 [Dkt. 97-3 at 3-4]). On three or four occasions, Plaintiff received letters from the Commission warning him that anyone providing for-hire transportation service originating in Hillsborough County must possess a certificate and that non-compliance could result in criminal prosecution. (*See* Pl. Dep. I at 87 and, Ex. 5 [Dkt. 97-3 at 13]). As the Commission's July 29, 2003 warning letter indicates, the Commission interprets the provision of the Special Act requiring a certificate to lawfully operate a public vehicle providing for-hire transportation "in Hillsborough County" as generally applicable

---

[10] *See also* Pl. Dep. I at 82-83  In the Pretrial Statement, Plaintiff states that, shortly after requesting an application, Plaintiff was informed by the Commission's Executive Director, Greg Cox, that Plaintiff would be unable to obtain a license for the minivan because the minivan does not satisfy the Commission's definition of limousine, which requires that a limousine meet luxury standards. Dkt. 114 at 2-3.

to for-hire transportation from points within Hillsborough County to points outside the county. (*See* Pl. Dep. I, Ex. 5 [Dkt. 97-3 at 13]; *cf.* Pl. Dep. I at 89-90; Pl. Dep II at 23).

By contrast, the Commission does not regulate public vehicles when the passengers are loaded outside Hillsborough County. (Dkt. 119, ¶ 4(n)). The only restriction the Commission places on Plaintiff is preventing him from loading passengers in Hillsborough County. (Pl. Dep. I at 78; *cf.* Pl. Dep. II at 28-29; Dkt. 114 at 3).

Plaintiff became a licensed "seller of travel" pursuant to Fla. Stat. § 559.927(10) in September, 2003. Believing he was no longer required to possess a certificate or permit to load passengers in Hillsborough County, Plaintiff on at least one occasion loaded an air traveler at TIA and delivered the passenger to a location outside Hillsborough County pursuant to a prearranged contract. (*See* Pl. Dep. I. at 7, 51-53, 101-102). In October, 2003, Plaintiff was arrested at TIA by a Commission inspector for operating a public vehicle in Hillsborough County without a certificate and permit. ([Pl. Dep. I at 77, 87-88; Pl. Dep. II at 38; Dkt. 88, ¶ 9).[11] When he was arrested, Plaintiff was attempting to load a passenger into his minivan, whom he had transported to TIA from Hernando County a few days earlier pursuant to a prearranged round-trip contract. (Pl. Dep. I at 17, 87-88; Pl. Dep. II at 38). The criminal charges were dismissed, as apparently has happened to charges against other limousine drivers. (Pl. Dep. I at 98-99; Dkt. 88, ¶ 10).

Since his arrest, Plaintiff has not provided return trips from Hillsborough County because he fears enforcement and arrest. (Dkt. 119, ¶ 4(f); Pl. Dep. I at 56: Pl. Dep. II at 21; *cf.* Dkt. 88, ¶ 10). Although still arranging round-trip transportation for Hillsborough County locations, Plaintiff

---

[11] The parties agree that allegations in the Second Amended Complaint regarding Plaintiff's October, 2003 arrest "are simply pled as background information and do not constitute operative facts upon which Count I is based." (Dkt. 119 at 4).

arranges for a certificate holder to provide the return trip. (Pl. Dep. I at 47-48, 73; Pl. Dep. II at 18, 23, 26-27, 31-32). Plaintiff testified that in some instances he has had to turn away potential clients because the certificate holder's smaller sedan could not accommodate the client's cargo (*e.g.*, a dog carrier) on the return trip. (Pl. Dep. II at 47-49).

Plaintiff has not been stopped or arrested by the Commission while driving the 15 passenger vehicle. (Dkt. 119, ¶ 4); Pl. Dep. I at 73). Since his arrest, Plaintiff has deliberately avoided any situation that might result in his being stopped or arrested while driving either of his vehicles. (Dkt. 119, ¶ 4(s)).

### *Procedural History*

Plaintiff initially filed this action in state court. It was removed to federal court. (Dkt. 1). In the original Complaint, Plaintiff alleged that his arrest was unlawful because Fla. Stat. §§ 341.102 and 559.939 and Article III, § 11(20) of the Florida Constitution prohibited the Commission from regulating state-licensed "sellers of travel" such as himself. (Dkt. 2, ¶¶ 19, 26, 64).

On September 24, 2004, Plaintiff's application for *Pullman* abstention was granted and the case was stayed to allow Plaintiff to file a declaratory judgment action in state court as to whether the Commission could, in accordance with state law, regulate state-licensed "sellers of travel." (Dkt. 44). The Thirteenth Circuit Court for Hillsborough County granted the Commission's motion for summary judgment, holding that the Commission had the authority to regulate "public vehicles" notwithstanding the provisions of Fla. Stat. §§ 341.102 and 559.939 and Article III, § 11(20). (Dkt. 48-4). The Florida Second District Court of Appeals affirmed. *See* Dkts. 57-2, 57-3; *Walter Kozak d/b/a Gunny's Intrastate Travel and Tours v. Hillsborough County Pub. Transp. Comm'n*, 979 So. 2d 229 (Table), 2008 WL 788395 (Fla. 2d DCA 2008).

Subsequently, Plaintiff filed an Amended Complaint in this action. Plaintiff alleged five claims: (1) "Federal authority over intrastate transportation" (Count I); (2) "Economic regulation and manipulation of the passenger ground transportation industry is a violation of the Sherman Act" (Count II); (3) "Commission regulatory scheme places discriminatory undue economic burdens on interstate commerce"(Count III); (4) "Application of 2001-299 is unequal and arbitrary" (Count IV); and (5) "Arrest of Kozak and seizure of property and threatened continued enforcement is unconstitutional" (Count V). (Dkt. 69).

Following dismissal of Plaintiff's Sherman Act, Commerce Clause, and Equal Protection Clause claims (Dkt. 83), Plaintiff filed a Second Amended Complaint realleging the following claims: (1) "Federal authority over intrastate transportation" (Count I); (2) "HCPTC regulatory scheme places a discriminatory undue burden on interstate commerce" (Count II); and (3) "Application of 2001-299 is unequal and arbitrary" (Count III). (Dkt. 88). After Counts II and III were dismissed with prejudice (Dkt. 95), rather than answering Count I,[12] the Commission filed the instant motion seeking summary judgment (Dkt. 96).

Although the parties agree that no factual disputes remain as to liability in Count I (Dkt. 119 at 1; Dkt. 114, ¶ 11), only the Commission has moved for summary judgment. The parties agree that Count I can be resolved as a matter of law on the admitted facts.

### *Justiciability*

Although the Commission does not challenge Plaintiff's standing to sue, "[t]he federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231

---

[12] At the January 5, 2010, oral argument, the Commission confirmed that the failure to answer was not inadvertent. Pursuant to Fed. R. Civ. 8(b)(6), the failure constitutes an admission of the well-pleaded facts in the Complaint. *See Burlington N. R. Co. v. Huddleston*, 94 F.3d 1413, 1415 (10th Cir. 1996).

(1990) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). To satisfy Article III's case or controversy requirement, "a plaintiff must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "[T]o demonstrate that a case or controversy exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Malowney v. Fed. Collection Deposit Group*, 193 F.3d 1342, 1346-47 (11th Cir. 1999) (citations omitted). The plaintiff must allege a real and immediate threat of future injury. *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1284 (11th Cir. 2001).

In determining whether a controversy is ripe, a court "look[s] primarily at two considerations: 'the hardship to the parties of withholding court consideration' and 'the fitness of the issues for judicial decision.'" *Alabama Power Co. v. U.S. Dep't of Energy*, 307 F.3d 1300, 1310 (11th Cir. 2002) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). "A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987) (citing *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 105 S. Ct. 3325, 3333 (1985)). However, "even where an issue presents purely legal questions, the plaintiff must show some hardship in order to establish ripeness." *Central & Sw. Servs. v. E.P.A.*, 220 F.3d 683, 690 (5th Cir. 2000).

The doctrines of standing and ripeness are closely related and frequently overlap. *See Smith v. Wisconsin Dep't of Agric., Trade and Consumer Prot.*, 23 F.3d 1134, 1141 (7th Cir. 1994); Erwin

Chemerinsky, Federal Jurisdiction § 2.4.1 (3d ed. 1999), quoted in *Alabama Power Co.*, 307 F.3d at 1310. In this case, the question of hardship for ripeness purposes is essentially identical to the question of whether an "imminent injury in fact" has been established for purposes of standing. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007).

Plaintiff has not been stopped or arrested by the Commission while driving his 15 passenger vehicle. Accordingly, Plaintiff's claim pursuant to 49 U.S.C. § 14501(a)(1)(C) essentially seeks pre-enforcement determination of the constitutionality of the Special Act as applied to the 15 passenger vehicle. This claim presents the purely legal question of the meaning of "charter bus transportation" in 49 U.S.C. § 14501(a)(1)(C); *cf. Abbott Labs.*, 387 U.S. at 149 (issue of statutory construction ripe for review when it raised only "purely legal" question of congressional intent).Moreover, Plaintiff presents evidence that postponing review would result in substantial hardship. Because he fears enforcement and arrest by the Commission, Plaintiff avoids loading passengers in Hillsborough County and his charter service business has apparently been diminished by general knowledge of his inability to provide round trip service to Hillsborough County. (Pl. Dep. I at 69, 77). Plaintiff should not be compelled to choose between complying with an allegedly unconstitutional rule that substantially restricts his business activities or disobeying the rule at the risk of a second arrest.[13]

As for Plaintiff's claim pursuant to 49 U.S.C. § 14501(c), Plaintiff has not applied for a certificate and permit for the minivan or for a waiver and variance. As a general rule, "to establish

---

[13] *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995); *GTE Directories Pub. Corp. v. Trimen America, Inc.*, 67 F.3d 1563, 1568 (11th Cir. 1995). The Commission's counsel stated at oral argument that the Commission acknowledges § 14501(a)(1)(C) and does not restrict anyone's authority to provide charter bus transportation. However, counsel argues that the services Plaintiff provides do not constitute charter bus transportation within the meaning of 49 U.S.C. § 14501(a)(1)(C), and the Commission has not disclaimed an intent to apply the Special Act to Plaintiff's use of the 15 passenger vehicle in Hillsborough County.

standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy." *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997); *see also Madsen v. Boise State Univ.*, 976 F.2d 1219, 1221 (9th Cir. 1992). "This threshold requirement for standing may be excused only where a plaintiff makes a substantial showing that application for the benefit . . . would have been futile." *Jackson-Bey*, 115 F.3d at 1096.[14]

Here, the Complaint alleges (Dkt. 88, ¶ 8) and Plaintiff presents unchallenged evidence that the luxury transportation service rule effectively precludes Plaintiff from acquiring a certificate and permit for the minivan (Pl. Dep. I at 80, 82). At oral argument, the Commission's counsel confirmed that Plaintiff's minivan would not qualify as a limousine under the Commission's rules. Although counsel was unable to state with certainty that Plaintiff would be unable to obtain a waiver and variance, the Commission recently denied a waiver of the luxury transportation service rule. *See Leib*, 558 F.3d at 1305. Favorably construed, the record contains minimally sufficient evidence that applying for a certificate and permit and requesting a waiver would be futile. *Cf. Prayze FM v. Fed. Commc'ns Comm'n*, 214 F.3d 245, 251 (2d Cir. 2000).

As for ripeness, although Plaintiff presents evidence of hardship if judicial review is denied pending the submission of a futile application and the substantial application fees (Pl. Dep. I at 78-81; *cf.* Dkt. 88, ¶ 20)), the record contains very little information about the actual effect of the luxury transportation service rule on prices or services. As discussed below, the issue is whether the luxury transportation service rule has a significant impact on prices, routes, or services of motor carriers with respect to the transportation of property. Notwithstanding, this scant evidentiary record is best

---

[14] *See also Sammon v. New Jersey Bd. of Med. Exam'r*, 66 F.3d 639, 643 (3d Cir. 1995); *Ellison v. Connor*, 153 F.3d 247, 255 (5th Cir. 1998).

understood as a failure of proof on Plaintiff's part, rather than the absence of a concrete factual setting involving application of the challenged rule. The adverse effect of the rule on Plaintiff's business activities is immediate, and the parties' disagreement about its constitutionality is neither abstract nor hypothetical.

### *Standard*

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. The evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

13

## Discussion

### 1.     *Preemption pursuant to 49 U.S.C. § 14501(a)(1)(C)*

Plaintiff contends that the Commission's requirement that Plaintiff obtain a certificate and permit before loading passengers in his 15 passenger vehicle in Hillsborough County is expressly preempted by Section 4016 of the Transportation Equity Act for the 21st Century ("TEA-21"), Pub. L. No. 105-178, 112 Stat. 107 (1998), which amended the     Federal Aviation Administration Authorization Act of 1994 (the "FAAA Act"), and which is codified at 49 U.S.C. § 14501(a)(1)(C).

The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. State law that conflicts with federal law is therefore "without effect." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). The purpose of Congress is "'the ultimate touchstone' in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963)).

Section 14501(a)(1)(C) protects providers of "charter bus transportation" from state or local regulation of operating authority. Section 14501(a) provides, in relevant part:

(a) Motor carriers[15] of passengers.--
     (1) Limitation on State law.--No State or political subdivision thereof . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to--

---

[15] A "motor carrier" is "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). Before August 10, 2005, "motor carrier" was defined as quoted. On August 10, 2005, Congress passed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub. L. No. 109-59, 119 Stat. 1144 (2005). Section 4142 of the SAFETEA-LU amended 49 U.S.C. § 13102 to replace the term "motor vehicle" with the phrase "*commercial* motor vehicle (as defined in [49 U.S.C. §] 31132)." *Id.* (emphasis added). On June 6, 2008, Congress passed the SAFETEA-LU Technical Corrections Act of 2008, Pub. L. No. 110-244, 122 Stat. 1572 (2008) ("Technical Corrections Act"). Section 305 of the Technical Corrections Act amended 49 U.S.C. § 13102(14) by striking "commercial motor vehicle (as defined in section 31132)" and inserting "motor vehicle." *Id.* The Technical Corrections Act effectively restored the definition of motor carrier to its pre-SAFETEA-LU state.

(C) the authority to provide intrastate or interstate charter bus transportation.

49 U.S.C. § 14501(a).[16]

The legislative history of TEA-21 suggests that Section 14501(a)(1)(C) was intended to "strike[] the authority of the states to regulate intrastate and interstate charter bus transportation." H.R. Rep. 105-550, at 496 (1998) (Conf. Rep.).

The Commission does not dispute that Section 14501(a)(1)(C) preempts its regulatory authority over Plaintiff's transportation services if Plaintiff uses a "bus" to provide "charter transportation." (Dkt. 96 at 13). However, the Commission argues that Plaintiff's 15 passenger vehicle is not a bus and the services Plaintiff provides is predominantly livery service rather than charter service.

As an initial matter, the latter argument does not defeat Plaintiff's claim. The Commission concedes that Plaintiff at times provides "true" charter service.[17] Even if supported by the record, the contention that the bulk of Plaintiff's business is not charter transportation does not support the conclusion that the Commission may, consistent with Section 14501(a)(1)(C), require Plaintiff to obtain a certificate and permit to provide charter bus transportation in Hillsborough County. *See Executive Transp. Sys., LLC v. Louisville Reg'l Airport Auth.*, No. 3:06-CV-143-S, 2007 WL 2571908 * 4 (W.D. Ky. Sept. 4, 2007) ("[A] plaintiff need not be solely engaged in charter bus operations to make a claim under § 14501(a)(1)(C).").

During oral argument, the Commission seemingly retreated from its concession that Plaintiff

---

[16] The Commission does not contend that the requirement of a certificate and permit for the 15 passenger vehicle falls within any exemption in 49 U.S.C. § 14501(a)(2).

[17] *See* Dkt. 96 at 10 ("[Plaintiff] sometimes provides charter service . . . ."); *cf.* Dkt. 96 at 18 ("[W]hile [Plaintiff] may periodically perform a trip properly characterized as a charter, the bulk of his business is livery service or intrastate prearranged ground transportation . . . ."); Dkt. 96 at 22 ("[Plaintiff] is only periodically performing true charter service . . . ."); Dkt. 114 at 2 ("Plaintiff does not provide *only* charter service.") (emphasis added).

provides "true" charter service. The Commission contended that the record contains no evidence that third-party travel agencies contract with Plaintiff to provide group transportation for their clients at a fixed price for the exclusive use of his 15 passenger vehicle. The Commission is mistaken. As detailed above, Plaintiff's testimony and business records demonstrate that travel agencies occasionally hire Plaintiff to provide round-trip group transportation for their clients to locations including the Port of Tampa and TIA at a fixed rate under a single contract and for the exclusive use of the 15 passenger vehicle. Favorably construed, the record contains evidence that Plaintiff provides charter service in Hillsborough County.[18]

TEA-21 does not define "charter bus transportation." Defining the term "bus" is therefore necessary in determining Congressional intent with respect to the scope of the intended preemption of state and local regulation of "charter bus transportation." The term "bus" appears to have no uniform definition elsewhere in the United States Code or the Code of Federal Regulations,[19] or in ordinary meaning.[20] In addressing the scope § 14501(a)(1)(C) preemption, one district court turned to state law to define "charter bus." *See Alex's Transportation, Inc. v. Colorado Pub. Util. Comm'n*, 88 F. Supp. 2d 1147, 1149 (D. Colo. 2000) (state law defined a charter bus as a vehicle with a minimum capacity of thirty-two passengers). Relying on *Alex's Transportation*, the Commission

---

[18] *See* 49 C.F.R. § 390.5 (defining "charter transportation of passengers" in part as "transportation . . . of a group of persons who pursuant to a common purpose, under a single contract, at a fixed charge for the motor vehicle, have acquired the exclusive use of the motor vehicle to travel together under an itinerary either specified in advance or modified after having left the place of origin"); *see also* 49 C.F.R. § 604.3(c); 49 C.F.R. § 374.503 (defining "special or chartered party"); *Greyhound Lines, Inc. v. City of New Orleans ex rel. Dep't of Pub. Util.*, 29 F. Supp. 2d at 344 ("The defining character of a charter for transport is the moving of a group, under a contract, at a fixed rate, for the exclusive use of the vehicle, for a specified itinerary.").

[19] *See* 49 U.S.C. § 30127(a)(1); 49 C.F.R. § 390.5; 49 C.F.R. § 571.3(b); 49 C.F.R. § 398.1(e); 49 C.F.R. § 374.303(b); 49 C.F.R. § 665.5.

[20] *See Rusello v. United States*, 464 U.S. 16, 21 (1983) (when Congress fails to define a term, a court should presume that Congress intended the term's ordinary meaning); *Crawford v. Metro. Gov't of Nashville & Davidson County*, --- U.S. ---, 129 S. Ct. 846, 850 (2009) (A term that is undefined in a statute bears its ordinary meaning).

argues that Florida law should define "bus" and "van."[21] In response, Plaintiff contends that his 15 passenger vehicle is a bus pursuant to both state and federal law.[22] Specifically, Plaintiff contends that his vehicle falls within the statutory definitions of "bus" in Fla. Stat. § 316.003(3) and 49 U.S.C. § 30127(a)(1).[23] Further, Plaintiff contends that preemption pursuant to Section 14501(a)(1)(C) depends not on the size or model of the vehicle but on the type of service provided.

I respectfully disagree with the analysis in *Alex's Transportation*. Notwithstanding that Plaintiff's 15 passenger vehicle is properly considered a "bus" under Florida law, applying state law

---

[21] The Commission concedes that the 15 passenger vehicle falls within the definition of bus in Fla. Stat. § 316.003(3), which provides that "[a]ny motor vehicle designed for carrying more than 10 passengers and used for the transportation of persons and any motor vehicle, other than a taxicab, designed and used for the transportation of persons for compensation."

However, the Commission notes that the 15 passenger vehicle also falls within the Special Act's definition of van, which includes vehicles with a capacity of 10 to 15 passengers operated to provide transportation of for-hire passengers. The Commission argues that, because the 15 passenger vehicle meets both definitions and because the Special Act prevails over a general statute, the 15 passenger vehicle is a van when it provides for-hire service in Hillsborough County, although it may be a bus elsewhere in Florida. Notwithstanding, the Commission demonstrates no irreconcilable conflict between the two definitions. That is, the Commission fails to explain why the fifteen-passenger vehicle, even when operating in Hillsborough County, cannot be both a "van" for purposes of Special Act and a "bus" for purposes of the Florida Uniform Traffic Control Act, pursuant to Fla. Stat. § 316.003(3).

[22] Plaintiff also argues that the Commission lacks authority under Florida law to regulate the 15 passenger vehicle because (a) the vehicle is not a van within the meaning of the Special Act, (b) the Commission's authority to regulate the operation of public vehicles in Hillsborough County does not extend to intercounty transportation, and (c) the Commission's authority to regulate Plaintiff's activities is "preempted" by Fla. Stat. § 341.102(1). However, the circuit court determined that Plaintiff is subject to the rules and regulations of the Commission in part because (i) "Plaintiff has collected fares *originating* in Hillsborough County while operating what constitutes a 'public vehicle' for hire" and (ii) "[t]he vehicles in which Plaintiff has operated and continues to operate [including Plaintiff's "15-passenger bus"] fall within the purview of the special act." (Dkt. 48-4 at 3) (emphasis added). Additionally, the circuit court determined that "Fla. Stat. § 341.102 does not shield Plaintiff from [Commission] regulation" since "Plaintiff's business activities fail to meet the criteria set forth under Fla. Stat. § 341.102 (1) or (2)." (Dkt. 48-4 at 3-4). Even if or to the extent that Plaintiff is not barred by the doctrines of *res judicata*, *see Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1356 (11th Cir. 1998) (*res judicata* acts as a bar not only to the legal theory presented in the previous litigation, but to legal theories and claims that could have been asserted based on the same nucleus of operative fact), and *collateral estoppel* from re-litigating his contention that the Commission lacks authority under Florida law to regulate the fifteen-passenger vehicle, this Court would follow the Second District Court of Appeal's memorandum decision and reject the contention. *See McMahan v. Toto*, 311 F.3d 1077, 1080 (11th Cir. 2002) (absent a decision from the state supreme court on an issue of state law, a federal court must follow decisions of the state's intermediate appellate courts unless there is some persuasive indication that the highest court of the state would decide the issue differently).

[23] Plaintiff does not contend that the 7 passenger minivan is a bus. *See* Dkt. 106 at 20 ("Plaintiff has avoided any claim that the minivan is a bus and subject to protection under [49 U.S.C. §] 14501(a)(1)(c) . . . .").

17

definitions in interpreting and applying federal preemption law would be inconsistent with the uniformity Congress intended to achieve by enacting Section 14501(a)(1)(C) and the accompanying provisions of the FAAA Act.[24] Moreover, except as they might illustrate ordinary meaning of terms, acts of the Florida legislature provide no indication of Congressional intent.[25]

Turning to federal law, when Congress passed TEA-21, 49 C.F.R § 393.5 defined "bus" as "[a] vehicle designed to carry more than 15 passengers, including the driver." *See* 49 C.F.R § 393.5 (1998).[26] Instructive in determining the scope of § 14501(a)(1)(C)'s preemption in this case, the definition in former 49 C.F.R § 393.5 finds some support in a subsequently enacted provision of the FAAA Act. The Real Interstate Driver Equity Act of 2001 ("RIDE Act") amended the FAAA Act by adding Section 14501(d). This section "[i]n essence . . . prohibits States from requiring out-of-state, for-hire vehicles that provide pre-arranged ground transportation service to pay a license or fee." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 288 (D.N.J. 2004). Section 14501(d) generally prohibits state and local authorities from:

> requiring a license or fee on account of the fact that a motor vehicle is providing pre-arranged ground transportation service if the motor carrier providing such service--
> (A) meets all applicable registration requirements under chapter 139 for the interstate transportation of passengers;
> (B) meets all applicable vehicle and intrastate passenger licensing requirements of the State or States in which the motor carrier is domiciled or registered to do business; and
> (C) is providing such service pursuant to a contract for--

---

[24] *See Rowe v. New Hampshire Motor Transp. Ass'n*, 128 S. Ct. 989, 996 (2008).

[25] *See Gonzalez v. Pingree*, 821 F.2d 1526, 1530 (11th Cir. 1987) (remarking in an unrelated context that "common sense dictates that the intent of Congress cannot be inferred from the actions of a state legislature.").

[26] This definition was removed in 2005 "in favor of the definition found in [49 C.F.R.] § 390.5." Parts and Accessories Necessary for Safe Operation; General Amendments, 70 Fed. Reg. 48008, 48011, 48026 (Aug. 15, 2005). 49 C.F.R § 390.5 defines a bus is "any motor vehicle designed, constructed, and or used for the transportation of passengers, including taxicabs."

(i) transportation by the motor carrier from one State, including intermediate stops, to a destination in another State; or

(ii) transportation by the motor carrier from one State, including intermediate stops in another State, to a destination in the original State.

Pub. L. 107-298 § 2, 116 Stat. 2342; 49 U.S.C. § 14501(d).

Further, the RIDE Act amended 49 U.S.C. § 13102, by adding the following definition:

Pre-arranged ground transportation service. The term "pre-arranged ground transportation service" means transportation for a passenger (or a group of passengers) that is arranged in advance (or is operated on a regular route or between specified points) and is provided in a motor vehicle with a seating capacity *not exceeding 15 passengers (including the driver).*(emphasis added)

Pub. L. 107-298 § 3(a)(2), 116 Stat. 2342; 49 U.S.C. § 13102(19).

The Senate Report states that the RIDE Act "would amend Federal transportation law to clarify that no State or political subdivision of a State, other than the home licensing State, may require a license or fee of a motor carrier or driver providing pre-arranged ground transportation service beginning in one State and ending in another, or beginning and ending in the same State with intermediate stops in or routing through another State." S. Rep. No. 107-237, at 2 (Aug. 1, 2002).[27]

Congress' enactment of Section 14501(d) and its reference to vehicles "with a seating capacity not exceeding 15 passengers" indicates that Congress drew a distinction in that context between vehicles with a passenger capacity of 15 or less and those having a greater passenger capacity. Presuming that Congress would not enact duplicative and therefore unnecessary legislation, the passage of new Section 14501(d) indicates that Congress did not consider the providing of ground transportation in vehicles with a seating capacity of 15 or less constituted "charter bus transportation." Otherwise, operation of these smaller vehicles would already have been protected by § 14501(a)(1)(C). One may reasonably infer therefore, that the distinction between

---

[27] *See* S. Rep. No. 107-237, at 1 (Aug. 1, 2002) ("Limousines, airport shuttles, executive sedans, black cars, and some taxicabs provide pre-arranged ground transportation services").

vehicles having a seating capacity of more than 15 and those with 15 or less is an indication that Congress does not consider a vehicle having a seating capacity of 15 or less to be a "bus" capable of providing charter transportation services.

While the RIDE Act and its legislative record may not provide an express definition of "bus" under federal law, when considered with the definition of "bus" in former 49 C.F.R § 393.5, it reflects a Congressional understanding of the term, at least in that context, to be a vehicle with a seating capacity of more than 15 passengers.[28] Moreover, application of the definition of "bus" in former 49 C.F.R § 393.5 to determine the preemptive scope of Section 14501(a)(1)(C) is consistent with the statement in the Conference Report that Section 14501(a)(1)(C) does not limit a State's ability to regulate taxicab service or limousine[29] livery service, H.R. Rep. 105-550, at 496.

Finally, the Court is not persuaded by Plaintiff's argument that "charter bus transportation" for purposes of Section 14501(a)(1)(C) refers only to a mode of travel. While that argument finds

---

[28] *See also* Ariz. Rev. Stat. Ann. § 28-101 (West, Westlaw through the 1st Reg. Sess. & 1st-4th Special Sess. (2009)); Ga. Code Ann., § 16-12-122(3) (West, Westlaw through 2009 Reg. Sess.); Me. Rev. Stat. Ann. tit. 29-A, § 101 (West, Westlaw through 2009 1st Reg. Sess.); Minn. Stat. §168.002(a) (West, Westlaw through 2009 Reg. Sess.); *id.* § 169.011 (West, Westlaw through 2009 Reg. Sess.); N. M. Stat. Ann. 1978, § 30-7-11.B (West, Westlaw through 2009 2d Sess.); N.Y. Veh. and Traff. Law § 104 (McKinney 2005); Ohio Rev. Code Ann. § 4513.50(A)(1) (West, Westlaw through 2009 File 17 of the 128th Gen. Assembly (2009-2010)); Or. Rev. Stat. Ann. § 184.675(6) (West, Westlaw through 2009 Reg. Sess.); R.I. Gen. Laws § 31-10.3-3(4) (LEXIS through Jan. 2009 Sess.); S.C. Code Ann. 1976, § 12-37-2810(G) (West, Westlaw through 2009 Reg. Sess.); *id.* § 56-35-10 (3); Tenn. Code. Ann. § 55-50-102(4) (West, Westlaw through 2009 1st Reg. Sess.); Utah Code Ann. 1953, § 41-6a-102(5)(a) (West, Westlaw through 2009 Gen. Sess. and 1st Special Sess. ); *id.* § 76-10-1503(1); Wyo. Stat. Ann. 1977, § 31-7-102(iii) (West, Westlaw through 2009 Sess.); *cf.* Mich. Comp. Laws. Ann. § 474.103(e) (West, Westlaw through P.A.2009, No. 200, of the 2009 Reg. Sess.). Several state statutes also define charter buses or charter bus transportation by reference to a minimum seating capacity that is greater than 15 persons. *See* Colo. Rev. Stat. Ann. § 40-16-101(1.3) (West, Westlaw through 1st Reg. Sess. (2009)) (minimum capacity of thirty-two passengers); Va. Code Ann. § 46.2-2000(West, through 2009 Special Sess. I) (same); 68 Okl. St. Ann. § 1357(36) (West, Westlaw through 1st Reg. Sess. 2009) (more than eighteen persons); 2 Del. C. § 1801(10) (West, Westlaw through 77 Laws 2009, chs. 1-214) (minimum capacity of 16 persons).

[29] The term limousine is sometimes defined in part as a motor vehicle having a capacity not exceeding fifteen passengers. *See, e.g.*, Ariz. Rev. Stat. § 28-101(27) (West, Westlaw through 1st Reg. Sess. and 1st-4th Special Sess. (2009)); La. Stat. Ann. § 45:162(12) (West, Westlaw through 2009 Reg. Sess.); Me. Rev. Stat. Ann. tit. 29-A § 101(32) (West, Westlaw through 2009 1st Reg. Sess.); N.J. Stat. Ann. § 33:1-1(a)(a) (West, Westlaw through L. 2009, c. 168); N.J. Stat. Ann. 34:11-56a1(m); *id.* § 48:16-13; Tenn. Code Ann. § 65-15-102(9) (West, Westlaw through 2009 1st Reg. Sess.); *cf.* Minn. Stat. §168.002(15) (West, Westlaw through 2009 Reg. Sess.) (13 passenger maximum).

some support in the case law, [30] charter service refers to the transportation of groups, not individuals.[31] Further, by employing the term "bus," TEA-21 refers to a vehicle larger than a sedan and, as the Conference Report suggests, larger than an ordinary limousine.

It is undisputed Plaintiff's vehicle is not designed to carry more than 15 passengers. (*See* Pl. Dep. I at 17-18). Because the Court concludes that "charter bus transportation" pursuant to Section 14501(a)(1)(C) includes transportation provided in a vehicle designed to carry more than 15 passengers (including the driver), the Commission's authority to require a certificate and license for the operation of Plaintiff's 15 passenger vehicle is not preempted by 49 U.S.C. § 14501(a)(1)(C).

## 2. *Preemption pursuant to 49 U.S.C. § 14501(c)*

Plaintiff further contends that by limiting certificates and permits for limousine service to "luxury" vehicles, the Commission's luxury transportation service rule prohibits Plaintiff from acquiring a certificate and permit for his minivan and thus limits his ability to meet his passengers' property transport needs in violation of 49 U.S.C. § 14501(c).[32]

The FAAA Act generally preempts state and local regulations "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). Borrowed from the Airline Deregulation Act of 1978 (the "ADA"), the statutory

---

[30] *See Executive Transp. Sys., LLC v. Louisville Reg'l Airport Auth.*, No. 3:06-CV-143-S, 2009 WL 1405154, *10 (W.D. Ky. May 18, 2009) ("Section 14501(a)(1)(C) prohibits 'any' local regulation 'relating to' the authority to provide 'charter bus transportation.' This language reflects Congress's broad objective of deregulating the charter bus industry. There is no indication in the text that the preemptive scope of the statute is contingent on vehicle seating capacities, group travel plans, or the like.") (emphasis added), *vacated in part on reconsideration*, --- F. Supp. 2d ---, 2010 WL 55931 (W.D. Ky. Jan. 4, 2010); *Greyhound Lines, Inc. v. City of New Orleans ex rel. Dep't of Pub. Util.*, 29 F. Supp. 2d 339, 345 (E.D. La. 1998) ("Section 14501 speaks specifically to a particular type of transportation (charter services) . . . .").

[31] *See* 49 C.F.R. § 390.5; 49 C.F.R. § 604.3(c); 49 C.F.R. § 374.503; *Greyhound Lines, Inc. v. City of New Orleans ex rel. Dep't of Pub. Util.*, 29 F. Supp. 2d at 344.

[32] Plaintiff also argues that the luxury service transportation rule is an unauthorized addition to the statutory definition of limousine in the Special Act. However, the Eleventh Circuit has expressly rejected this argument. *See Leib v. Hillsborough County Pub. Transp. Comm'n*, 558 F.3d 1301, 1308 (11th Cir. 2009).

language has been interpreted consistently with decisions interpreting the ADA. *See Rowe v. New Hampshire Motor Transp. Ass'n*, 128 S. Ct. 989, 994-95 (2008); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992). In *Morales*, the Court broadly interpreted the term "relating to" in the ADA as preempting "'[s]tate enforcement actions *having a connection with, or reference to'* carrier 'rates, routes, or services.'" *Rowe*, 128 S. Ct. at 995 (quoting *Morales*, 504 U.S. 384). *Morales* also determined that " pre-emption may occur even if a state law's effect on rates, routes or services 'is only indirect.'" *Rowe*, 128 S. Ct. at 995 (quoting *Morales*, 504 U.S. at 386). In *Rowe*, the Court held that the same broad interpretation applies to the "related to" language of 49 U.S.C. § 14501(c)(1). 128 S. Ct. at 994-95.

The chief purpose of Section 14501(c)(1) is to deregulate certain aspects of intrastate transportation that place unreasonable burdens on free trade, interstate commerce, and consumers. *See* Pub. L. 103-305, § 601(a), 108 Stat. 1605; *City of Columbus v. Ours Garage and Wrecker Serv., Inc.*, 536 U.S. 424, 440 (2002).[33] On the other hand, Section 14501(c)(1) "does not pre-empt state laws that affect rates, routes, or services in 'too tenuous, remote, or peripheral a manner.'" *Rowe*, 128 S. Ct. at 997 (quoting *Morales*, 504 U.S. at 391). A state law is preempted only if it has a "*significant impact* on carrier rates, routes, or services," *Rowe*, 128 S. Ct. at 997 (quoting *Morales*, 504 U.S. at 391), or on the FAAA Act's "ability to achieve its pre-emption-related objectives," *Rowe*, 128 S. Ct. at 995 (citing *Morales*, 504 U.S. at 390).[34]

Here, the Commission's luxury transportation service rule has not been shown to significantly impact rates, route, or services with respect to the transportation of property incident

---

[33] The Conference Report listed Florida as one of the jurisdictions that did not regulate intrastate prices, routes or services of motor carriers. *See* H.R. Rep. No. 103-677, at 87 (1994) (Conf. Rep.).

[34] The Commission does not contend that the Commission's luxury transportation service rule falls within any exemption in 49 U.S.C. § 14501(c)(2).

to passenger travel.[35] Accordingly, the Commission's luxury transportation service rule is not preempted by Section 14501(c)(1). The rule does not "reference" price, route, or services with respect to the transportation of property. The rule's effect on the carriage of passenger "property," including luggage, pet carriers, wheelchairs, sporting equipment *etc.*, is simply too remote and tenuous to fall within Congress' intended preemption. *See Rowe*, 128 S. Ct. at 997 (Section 14501(c)(1) "does not pre-empt state laws that affect rates, routes, or services in 'too tenuous, remote, or peripheral a manner.'") (quoting *Morales*, 504 U.S. at 391).

### *Conclusion*

Because Plaintiff does not provide "charter bus transportation" in his fifteen-passenger vehicle, the Commission's statutory authority to require Plaintiff to obtain a certificate and permit before loading passengers in the fifteen-passenger vehicle in Hillsborough County is not preempted by 14501(a)(1)(C). Further, the record contains no substantial evidence that the Commission's luxury transportation service rule has a significant effect on price, route, or service "with respect to the transportation of property," which would otherwise trigger preemption pursuant to 49 U.S.C. § 14501(c).

---

[35] As to its effects, Plaintiff argues that the rule affects both service and prices by compelling certain passengers with special cargo needs who lack access to public transportation to pay a premium price to hire a larger, more expensive vehicle rather than a minivan, which is less costly to operate. *See also* Pl. Dep. I at 83. That is, Plaintiff alleges that the rule in effect prohibits what in some instances would be a more efficient method of transporting passengers and their luggage and by doing so, increases the price for certain consumers of transporting themselves and their luggage.

The only evidence in the record suggesting such an impact is Plaintiff's testimony that, on certain occasions not reflected in his business records, he had to turn away potential clients because the sedan of the certificate holder available to perform a return trip from Hillsborough County could not accommodate the client's cargo. (Pl. Dep. II at 47-49). Even as to these passengers, Plaintiff presents no evidence of their actual travel arrangements (*e.g.*, whether they ultimately chose to take a cheaper airport shuttle, a taxicab, a larger limousine, or some other mode of transportation), and almost no evidence of actual prices. In sum, Plaintiff fails to present or identify and the record does not contain substantial evidence that the limousine luxury rule has a significant impact on the price, route, or services with respect to motor carrier transportation of property.

Accordingly, it is **ORDERED AND ADJUDGED:**

1) Defendant's Motion for Summary Judgment (Dkt. 96) is **GRANTED**.

2) The Clerk is directed to enter judgment on Count I of the Second Amended Complaint against Plaintiff Walter Kozak, d/b/a Gunny's Intrastate Travel and Tours and in favor of Defendant Hillsborough County Public Transportation Commission.

3) The Clerk is directed to close the case.

**DONE AND ORDERED** this _16th_ day of February, 2010.


JAMES D. WHITTEMORE
United States District Judge


Copies to: Plaintiff
Counsel of Record